UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

GRUBB & ELLIS COMPANY, et al.

                              Debtors.

---

VINCENT CARREGA, NEIL HELMAN,
JON EPSTEIN, CHARLES KINGSLEY,
YOAV OELSNER, JASON MESTER,
MICHAEL GOTTLIEB, HOWARD
GRUFFMAN, MARTIN COTTINGHAM,
and THE AD HOC COMMITTEE OF
BROKERS,

                              Appellants,

                    v.

GRUBB & ELLIS COMPANY, BGC
PARTNERS, INC., and THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS,

                              Appellees.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  December 15, 2014

**MEMORANDUM
OPINION & ORDER**

12 Civ. 3628 (PGG) &
12 Civ. 3756 (PGG) (Consolidated)

PAUL G. GARDEPHE, U.S.D.J.:

These bankruptcy appeals arise out of the 2012 financial collapse of Grubb &

Ellis Company ("Grubb and Ellis" or the "Company"), a commercial real estate and property

management business.  Appellants – former Grubb & Ellis brokers – object to an order

approving the sale of substantially all of the Company's assets "free and clear of all claims, liens,

rights, interests and encumbrances" to BGC Partners, Inc. ("BGC") (the "Sale Order"), entered

on March 27, 2012 by United States Bankruptcy Judge Martin Glenn.  For the reasons stated

below, the Sale Order will be affirmed.

# BACKGROUND

The debtors in this action are Grubb & Ellis and its affiliated entities (collectively, the "Debtors").[1] Together with Grubb & Ellis's purchaser, BGC, and the Official Committee of Unsecured Creditors, they are the Appellees in this action.[2] Appellants – real estate brokers formerly employed by the Debtors – are comprised of two groups that, for ease of reference, will be referred to throughout this opinion as the MSF Brokers[3] and the Ad Hoc Committee of Brokers (or Ad Hoc Committee)[4] (collectively, "Appellants"). The MSF Brokers and the Ad Hoc Committee of Brokers filed separate appeals of the Sale Order. See Case Nos. 12 Civ. 3628

---

[1] Those entities include:  Grubb & Ellis New York, Inc.; Grubb & Ellis Affiliates, Inc.; Grubb & Ellis of Arizona, Inc.; Grubb & Ellis of Michigan, Inc.; Grubb & Ellis of Nevada, Inc.; Las Vegas Commercial Brokerage, LLC; Grubb & Ellis Consulting Services Company; Grubb & Ellis Capital Corporation; Grubb & Ellis Equity Advisors, LLC; Grubb & Ellis Landauer Valuation Advisory Services, LLC; GBE Alesco Corp.; Grubb & Ellis Securities, Inc.; Grubb & Ellis Management Services, Inc.; Grubb & Ellis Management Services of Michigan, Inc.; Grubb & Ellis Apartment REIT Advisor, LLC; and Grubb & Ellis Healthcare REIT II Advisor, LLC. (Appellees' Joint Opening Br. (Dkt. No. 15) at 1 n.1)

[2] The Debtors and the Official Committee of Unsecured Creditors have submitted a joint brief. (Appellees' Joint Opening Br. (Dkt. No. 15))  BGC has filed a brief on its own behalf.  (BGC's Opening Br. (Dkt. No. 14)).

[3] The MSF Brokers include Vincent Carrega, Neil Helman, Jon Epstein, Charles Kingsley, Yoav Oelsner, Jason Meister, Michael Gottlieb, Howard Grufferman, and Martin Cottingham.  See Notice of Appeal (Dkt. No. 1) at 1, Case No. 12 Civ. 3628 (PGG).

[4] The Ad Hoc Committee of Brokers consists of Elaine R. Battagia, John W. Beers, Eric J. Berggren, Simon Clark, Conor Coakley, Andrew P. Connolly, David Cravath, Jeffrey D. Cristal, Vince D'Amico, Kyle Eaton, Gerald Z. Gibian, Neal (Dan) Gronich, Maryilyn Hansen, Joseph F. Harkins, Eric Haskins, Jeffrey Hyman, Alex T. Jelepis, Michael Kammerling, Bill B. Kanter, John C. Kinsella, Robert E. Lee, Robert H. Mayer, Jonathan Miller, Jeff Moeller, Michael R. Myrick, Trevor Patterson, Deborah Perry, J. Gilbert Plavcan, Jerry (Marshall) Putterman, Kevin J. Riley, Richard Rosenthal, Steve Roth, Ira Rovitz, William D. Saltzman, Robert S. Shapiro, Robert Shuster, Anne Deason Spencer, Barrett Stern, Dean Tselepis, Alfred Twainy, Joel Wechsler, Alan Weissman, Robert D. Yaffa, Larry Zuckerman, and David F. Zwang.  See Notice of Appeal (Dkt. No. 1) at 1 n.1, Case No. 12 Civ. 3756 (PGG).

(PGG) and 12 Civ. 3756 (PGG).  On June 4, 2012, at the request of the parties, this Court consolidated the appeals.  (Dkt. No. 6)[5]

The subject of these consolidated appeals are certain pre- and post-petition broker commissions that Appellants claim were wrongfully made part of the bankruptcy sale over their limited objections.  (See MSF Limited Objection to Motion for Order Approving the Sale of Substantially all of the Debtors' Assets ("MSF Brokers' Objection") (Bankr. Dkt. No. 238) ¶ 6; Statement Seeking Clarification and Reservation of Rights of the Ad Hoc Committee of Brokers with Respect to the Debtor's Motion for an Order Authorizing and Approving the Sale of Substantially all of the Debtors' Assets ("Ad Hoc Committee's Objection") (Bankr. Dkt. No. 239) ¶ 3)

Appellants challenge the Sale Order on three grounds.  They contend that the bankruptcy court erred by (1) adjudicating Appellants' rights to the disputed commissions without affording them an opportunity to present evidence at an adversary proceeding; (2) placing the burden on Appellants to prove that the commissions were not the property of the bankruptcy estate; and (3) concluding that the commissions belong to the bankruptcy estate rather than to Appellants.  (See MSF Brokers' Opening Br. (Dkt. No. 17) at 3)[6]

Although Appellants disclaim any desire to "unwind" the bankruptcy sale through this appeal (see MSF Brokers' Reply Br. (Dkt. No. 18) at 2), Appellants contend that they "are entitled to an adversary proceeding [pursuant to Bankruptcy Rule 7001] to determine their state law property rights."  (MSF Brokers' Opening Br. (Dkt. No. 17) at 46)  In the alternative,

---

[5] Documents identified by "Bankr. Dkt. No." are docketed in the bankruptcy court action, Case No. 12-10685 (MG).  Unless otherwise noted, all other documents referred to in this opinion are docketed in Case No. 12 Civ. 3628 (PGG).
[6] The Ad Hoc Committee has filed opening and reply briefs, see Dkt. Nos. 21, 22, but relies on the legal arguments set forth in the MSF Brokers' briefs.

Appellants argue that this Court should issue a declaratory judgment that (1) a constructive trust applies to the commissions Appellants seek, and that the bankruptcy court erred "in failing to carve out the Commissions from the Debtors' estates"; and (2) the "Commissions earned by [Appellants] and collected by Debtors <u>after</u> the February 20, 2012 Chapter 11 filings are not included in the assets sold to BGC." (Id.)

## I.   <u>THE DEBTORS' 2012 BANKRUPTCY FILING</u>

At the time of its 2012 bankruptcy, Grubb & Ellis was a publicly traded real estate company that employed more than 1,300 brokers, including Appellants. (Declaration of Michael J. Rispoli Pursuant to Local Bankruptcy Rule 1007-2 ("Rispoli 1007 Decl.") (Bankr. Dkt. No. 2) ¶¶ 8, 36) The Company's financial woes were precipitated by the 2007-2009 collapse of the real estate and financial markets and exacerbated by the Company's ill-timed merger with NNN Realty Advisors, Inc., a real estate investment management firm. (<u>Id.</u> ¶¶ 12, 79-81) In early 2011, Grubb & Ellis embarked on a strategy aimed at restructuring its operations and improving its liquidity. (<u>Id.</u> ¶ 94) In furtherance of these goals, the Company raised $28 million in financing through a credit facility with Colfin GNE Loan Funding, LLC, and C-III Investments (the "Senior Secured Debt"). (<u>Id.</u> ¶¶ 45-46) Grubb & Ellis also engaged a financial advisor – JMP Securities, LLC ("JMP") – to help it either obtain financing or sell some or all of its assets. (<u>Id.</u> ¶ 95) As part of its efforts to assist Grubb & Ellis, JMP approached 44 potential sale partners, including BGC. (<u>Id.</u> ¶¶ 97, 104) Although Grubb & Ellis entered into negotiations with BGC, the parties could not reach agreement on sale terms prior to the expiration of BGC's exclusive negotiating window. (<u>Id.</u> ¶ 104) Shortly thereafter, Grubb & Ellis concluded that an out-of-court sale or restructuring was not practical, and that a bankruptcy sale pursuant to 11 U.S.C. § 363 presented the only viable path forward. (<u>Id.</u> ¶ 105) Accordingly, on February 12,

4

2012, the Company retained Alvarez & Marsal Holdings, LLC ("A & M") to assist it with the bankruptcy process. (Id. ¶¶ 106-07)

On February 20, 2012 (the "Petition Date"), the Debtors formally filed a voluntary petition for Chapter 11 bankruptcy, together with an accompanying declaration from Michael J. Rispoli, Grubb & Ellis's Chief Financial Officer ("CFO") and Executive Vice President. (Chapter 11 Petition (Bankr. Dkt. No. 1); Rispoli 1007 Decl. (Bankr. Dkt. No. 2) ¶ 1) In his Declaration, CFO Rispoli outlined Grubb & Ellis's precarious financial position, noting that a large number of its brokers – representing nearly 30% of the Debtors' overall 2011 brokerage revenue – had already left the Company, and that the Debtors expected to have insufficient cash to meet their operating needs for the first quarter of 2012. (Rispoli 1007 Decl. (Bankr. Dkt. No. 2) ¶¶ 20, 115)  Rispoli further explained that A & M had arranged for BGC to purchase the Senior Secured Debt from the Debtors' pre-petition lenders and to submit a stalking horse bid for the Debtors' assets. (Id. ¶¶ 120-27)   Accordingly, on the same day as their bankruptcy filing, the Debtors moved the bankruptcy court to, inter alia, approve bidding procedures as well as the sale of substantially all of Debtors' assets free and clear of any interests, claims, or liens pursuant to 11 U.S.C. § 363(b). (Sale Motion (Bankr. Dkt. No. 12)) The Debtors warned that an expedited sale process was "critical":

> As the personal relationships among Grubb & Ellis's brokers and clients are essential to its continued successful operations, it is critical that the Debtors' financial condition and liquidity be quickly stabilized and that the Debtors' employees are made confident in the businesses' ability to continue as a going concern.  Absent such assurances, it is likely that more employees and contractual counterparties will leave Grubb & Ellis, thereby devaluing its operations further and jeopardizing the Proposed Sale.

(Rispoli 1007 Decl. (Bankr. Dkt. No. 2) ¶ 22)

On March 7, 2012, the bankruptcy court issued an order that, among other things, approved bid procedures and bid protections for the sale of substantially all of the Debtors'

assets, approved the Debtors' asset purchase agreement ("APA") with stalking horse bidder

BGC, and scheduled an auction and sale hearing.  (Mar. 7, 2012 Order (Bankr. Dkt. No. 94))

The March 7 Order set the sale hearing date for March 22, 2012, and imposed a March 16, 2012

filing deadline for objections to the proposed sale.  (Id. at 5)  The Ad Hoc Committee of Brokers

and the MSF Brokers each filed timely objections.  (Bankr. Dkt. Nos. 238 & 239)

## II.    THE ASSET PURCHASE AGREEMENT AND BROKER LOAN PROGRAM

The Debtors filed their proposed asset purchase agreement ("APA") with BGC on

March 2, 2012.  (Bankr. Dkt. No. 74-1)  Pursuant to the terms of the APA, BGC agreed to

purchase substantially all of the Debtors' assets for (a) $30,029,055.70 (the amount of prepetition

secured obligations), plus (b) the principal amount of loans made under the debtor-in-possession

financing, plus (c) any cure amount paid by BGC for the acquired assets, plus (d) $15,000,00 in

cash, subject to adjustment in accordance with Section 1.3 of the Stalking Horse APA.  (March

7, 2012 Order (Bankr. Dkt. No. 94), Ex. 1, "Bidding Procedures" at 3)

The APA makes no mention of broker commissions.  However, the term

"acquired assets" is defined broadly and includes, inter alia, "all cash and cash equivalents" as

well as all "[a]cquired [r]eceivables."  (APA, Art. VIII (Bankr. Dkt. No. 74-1) at 32)  The APA

defines "[a]cquired [r]eceivables," in turn, as

> all trade and other accounts receivable and notes and loans receivable that are or
> may become payable to a Seller or a Subsidiary of a Seller for products delivered
> or services provided pursuant to an Assigned Contract, a note or loan payable, or
> otherwise . . . .

(Id. at 34)  The APA also defines "excluded assets"; this term does not include broker

commissions.  (Id. at 36-37)

On March 1, 2012, the Debtors filed a motion pursuant to 11 U.S.C. §§ 363(b)

and 503(c) (Bankr. Dkt. No. 65), which was subsequently amended on March 7, 2012 (Bankr.

6

Dkt. No. 95), seeking the bankruptcy court's authorization for a broker loan program (the "Loan Program"). The amended motion explains that

> [a]s part of their compensation packages, [Grubb & Ellis] Brokers are entitled to receive commissions (the "Commissions") consisting of a percentage of the purchase or rental price from brokered deals. Brokers are also entitled to reimbursement expenses (the "Expenses") incurred in connection with brokered deals. As of the Petition Date, many of the Brokers were owed Commissions and Expenses.

(Id. ¶ 8) At the time of the bankruptcy sale, the money owed to the brokers included commissions and expenses accrued from both pre-petition transactions – that had either already closed or were scheduled to close – and post-petition transactions. (Sale Hearing Transcript ("Tr.") (Bankr. Dkt. No. 839) 84-87) In urging the bankruptcy court to implement the Loan Program, the Debtors declared that the brokers were their "most valuable asset" and noted that, "absent the[ir] retention . . . , the Debtors' businesses will lose more of their value, hindering a successful Sale." (Amended Motion (Bankr. Dkt. No. 95) ¶ 7) Accordingly, the Debtors and BGC proposed establishing the Loan Program to "allow the Debtors to pay the loan proceeds to the Brokers on an expedited basis to preserve the Debtors' enterprise value pending consummation of the Sale." (Id. ¶ 6)

Under the terms of the proposed Loan Program, Grubb & Ellis would – in lieu of paying the brokers their accrued commissions and expenses – give participating brokers a forgiveable loan. (Id. ¶ 17) So long as a broker continued to work for BGC for up to two years, died or became physically disabled, or was terminated by BGC without cause, the loan would be forgiven. (Id.) If, on the other hand, a participating broker stopped working for BGC for any other reason, the loan would become due immediately. (Id.) The Loan Program further required that participating brokers release Grubb & Ellis from any pre-petition claims relating to their commissions and expenses. (Id. ¶ 19)

7

The bankruptcy court scheduled a hearing for March 14, 2012 to consider the Debtors' motion and any objections to the proposed Loan Program. (Bankr. Dkt. No. 95-5) Several parties, including the Ad Hoc Committee of Brokers (but not the MSF Brokers), submitted objections. (Bankr. Dkt. No. 112) The Debtors responded to these objections by noting that "post-petition[,] more than 60 Brokers" had left Grubb & Ellis to seek employment with competitors, and that the Loan Program was intended to "implement a voluntary program whereby a Broker can, if they so choose, avail themselves of the ability to obtain a forgivable loan against [their pre-petition] commissions." (Rispoli Decl. in Support of Amended Motion (Bankr. Dkt. No. 123) ¶ 25) The Debtors further emphasized that the Loan Program would not "prejudice a Broker's ability to seek payment of . . . Commissions on an administrative priority basis." (Id. ¶ 28) At the March 14, 2012 hearing, Debtors's counsel agreed to postpone consideration of the Loan Program until March 22, 2012, the date of the sale hearing.

## III.    TERMS OF THE BROKER AGREEMENTS

The day before the sale hearing, the Debtors submitted a declaration from CFO Rispoli in further support of the Sale Motion. ("Rispoli Decl." (Bankr. Dkt. No. 765)) Broker agreements between Grubb & Ellis and eight of the nine MSF Brokers were attached to the Rispoli Declaration as exhibits. (See Bankr. Dkt. Nos. 765-3 through 765-10)

The broker agreements, which contain different terms, set forth the nature of the employment relationship[7] between each MSF Broker and Grubb & Ellis, and the governing commission rate.[8] Five of the eight broker agreements contain language to the effect that Grubb

---

[7]  Some of the broker agreements establish an employer/employee relationship between the broker and the Company, see, e.g., Gottlieb Agreement (Bankr. Dkt. No. 765-5), while others categorize the brokers as independent contractors. See, e.g., Carrega Agreement (Bankr. Dkt. No. 765-3).

[8]  In six of the broker agreements, the commission rates are redacted.

& Ellis "owns all commissions and fees paid in exchange for the real estate services provided by

its agents." (See, e.g., Helman Agreement (Bankr. Dkt. No. 765-4) at 2)

       The Rispoli Declaration, which was introduced at the sale hearing, contains the

following explanation of the Debtors' practices regarding broker ("Agent") commissions:

21.    The Agents' relationships with the Debtors are either memorialized in an employment agreement or independent contractor agreement. The Agents are entitled to commissions from Debtors based on the terms of their respective agreements with the Debtor entities.

22.    When the Debtors obtain a new third-party client – for a purchase, sale or lease transaction – the client enters into a contract with a Debtor entity ("Commissions Agreements").

23.    These Commission Agreements are between the client and the relevant Debtor entity, as broker. The Agents are not parties to the Commission Agreements.

24.    Upon the closing of a sale transaction, the relevant Debtor entity receives proceeds to consummate the sale. The funds are deposited into the Debtors' general account, which was the practice prior to the Petition Date.

25.    The general account is not used exclusively for commissions, and as such, these funds are co-mingled with funds from other sources, all of which, are available for the general operations of the Debtors.

26.    For sale transactions, Agents are paid commissions from the Debtors after transaction closings and receipt of funds.

27.    For lease transactions, Agents are generally paid after the transaction is closed and the commission is received by the Debtor. In either case, Agents are paid from the Debtors' general account, which was also the practice prior to the Petition Date.

28.    The Debtors are the sole owner of the commissions received from the clients. Presently, and prior to the Petition Date, the Debtors are not required to segregate the commissions and are not subject to any restrictions on use of the commissions.

29.    Although an Agent's right to a commission is contingent upon the closing or signing of that particular transaction and the payment to the Debtor, once a transaction is closed or signed, the Agent's performance is considered substantially complete.

(Rispoli Decl. (Bankr. Dkt. No. 765) ¶¶ 21-29)  Appellants did not submit any declarations or

rebuttal evidence in advance of the sale hearing.

## IV.     APPELLANTS' OBJECTIONS AND THE DEBTORS' RESPONSE

Both the MSF Brokers and the Ad Hoc Committee filed objections to the

proposed bankruptcy sale.  (MSF Brokers' Objection (Bankr. Dkt. No. 238); Ad Hoc

Committee's Objection (Bankr. Dkt. No. 239))

The MSF Brokers' Objection – which is a "limited objection" – states that,

> [w]hile the Brokers do not object to the proposed Sale, the Brokers seek to clarify
> that the Brokers' Commissions will not be inadvertently and unjustly transferred
> to the Purchaser in connection with the Sale and, unless the order approving the
> Sale is modified as proposed herein, object to the Sale to the extent the Debtors
> are seeking to sell the Debtors' assets free and clear of Brokers' Constructive
> Trust Claims, which should be expressly preserved either against the Debtors'
> estates or the Purchaser under any proposed order approving the Sale.

(MSF Brokers' Objection (Bankr. Dkt. No. 238) ¶ 8)

The MSF Brokers requested the following "clarification" to the proposed sale

order:

> Nothing contained in the APA or this Order shall be construed:  (i) to (a) limit the
> rights, if any of [the MSF Brokers (the "Brokers")], who are parties to agreements
> with the Debtors, to pursue claims for commissions and other applicable
> compensation (the "Compensation") on the grounds that the Debtors, their estates
> or the Buyer Group, hold such Compensation in trust for the Brokers (including,
> without limitation, because they hold the Brokers' shares of commissions paid to
> them in constructive trust or as trustee ex maleficio) or (b) determine that the
> Brokers' share(s) of any unpaid commissions is or shall become the property of
> the Buyer Group or that the Brokers stand in a traditional creditor-debtor
> relationship with the Debtors or their estates as to their claims for Compensation;
> or (ii) to limit the Brokers' rights to assert administrative priority claims, if any,
> with respect to such Compensation, pursuant to [S]ection 503 of the Bankruptcy
> Code, against the Debtors or their estates.

(Id. ¶ 9)

The Ad Hoc Committee styled its objection to the proposed sale as a "statement

seeking clarification and reservation of rights."  (Ad Hoc Committee's Objection (Bankr. Dkt.

No. 239) at 1)  The Ad Hoc Committee explained that it did not oppose the sale, but sought

"clarification with respect to the Debtors' and the prospective purchaser's [i.e., BGC's]

definition of pre- versus post-petition commissions, [BGC's] intentions with respect to payment

of the same, and the retention, if any, by [BGC] of any commissions paid after the closing of the

Sale." (Id. ¶ 1)  The Ad Hoc Committee's Objection asserts that

> many of the Debtors' brokers are owed commissions on account of transactions
> where the third parties have already remitted payment to the Debtors prior to the
> filing date, but the Debtors have withheld payment of the brokers' share of the
> total commission.  These commissions are clearly pre-petition.  [Additionally,]
> [i]n the normal course of business, since the bankruptcy filing, transactions have
> occurred with the assistance of the brokers, and commissions are owed only upon
> the finalization and/or closing of those transactions.  These commissions are all
> post-petition, and should be afforded administrative priority.

(Id. ¶ 5)

Although the Ad Hoc Committee did not oppose the sale, it sought "assurances

and representations" from BGC that would "allow the brokers to make informed and educated

decisions about their future[.]"  (Id. ¶ 6)  More specifically, the Ad Hoc Committee asked that

BGC disclose and/or represent the following:

> [1] what [BGC] believes it is buying, [2] that [BGC] is not purchasing
> commissions owed to the brokers not yet received by the Debtors, and [3] that
> commissions paid by third parties after the closing of the sale will be paid in the
> ordinary course to the brokers as they become due.

(Id.)  The Ad Hoc Committee did not assert a constructive trust claim or otherwise join in the

MSF Brokers' Objection.

The Debtors filed an omnibus response to these and other objections (the

"Debtors' Response" (Bankr. Dkt. No. 763), and BGC submitted a declaration in support of the

Sale Motion from its financial advisor ("Edelman Decl." (Bankr. Dkt. No. 769)).[9]

---

[9]  The Official Committee of Unsecured Creditors also filed a statement supporting the Sale
Motion.  (Bankr. Dkt. No. 779)

11

With respect to Appellants' limited objections, the Debtors asserted that "[c]ommissions collected, and receivables for commissions not yet collected, are property of the [Debtors'] estate[ ] and can be sold free and clear of liens, claims and encumbrances." (Debtors' Response (Bankr. Dkt. No. 763) ¶ 48)  The Debtors further noted that Appellants did not dispute that "the Debtors' agreements with third-party clients provide that commissions are owed to the Debtors (not the Agents), and the Agents' right to payments stems solely from the Agents' separate agreements with Debtors (not the clients)." (Id. (citing Rispoli Decl. (Bankr. Dkt. No. 765) ¶ 23)))  Finally, the Debtors argued that Appellants had "conceded that they are subject to written agreements with the Debtors" and thus precluded from making a constructive trust claim, given law "in this Circuit [that] constructive trust is a remedy imposed only in the absence of a written agreement." (Id. ¶ 50 (citing Superintendent of Ins. V. Ochs (In re First Central Fin. Corp.), 377 F.3d 209, 213 (2d Cir. 2004) ("[W]e conclude that this principle – that the existence of a written agreement precludes a finding of unjust enrichment – also applies to constructive trust claims. . . .").

## V.   SALE HEARING

On March 22, 2012, the bankruptcy court conducted the scheduled sale hearing and heard argument regarding the merits of the Sale Motion. [10]

---

[10]  Earlier that day, the bankruptcy court issued an order containing instructions for marking evidentiary exhibits.  That order states:  "[a]t the time the Court approved the bidding procedures and stalking horse contract, the Court announced that the sale hearing would be an evidentiary hearing."  (Mar. 22, 2012 Order Regarding Sale Hearing (Bankr. Dkt. No. 798))  Similarly, the bankruptcy court's "Memorandum Opinion Approving the Sale of Substantially all of the Debtors' Assets" states – without citations to the record – that (1) "[a]t the time the Court approved the bidding procedures, the Court announced that the sale hearing would be an evidentiary hearing"; and (2) "[a]t the March 14, 2012 hearing, the Court also stated that it expected all parties to present evidence in support of their motions or objections at the Sale Hearing."  See In re Grubb & Ellis Co., 12-10685 MG, 2012 WL 1036071, at *3 & n.2 (Bankr.

At the hearing, the Debtors introduced declarations from several individuals involved in the bankruptcy sale, including a declaration from CFO Rispoli (Dkt. No. 765). (Id. at 67-70) Andrew Glenn, counsel for the MSF Brokers, objected to paragraphs 21 through 29 of the Rispoli Declaration, as well as the employment agreements of his clients that were attached thereto. (Id. at 70-71) Counsel argued that it was premature for the court to consider the constructive trust issue, but the bankruptcy judge disagreed:

> Mr. Glenn:   The basis of my objection, Your Honor, is primarily one of relevance. Our objection raised the specific and focused legal issue about whether a debtor can sell its assets in this case free and clear [from] our claims for a constructive trust. Ultimately, constructive trust claims, as we understand them, have to be brought pursuant to [Fed. R. Bankr.] Rule 7001, et cetera.
>
> In addition, if a debtor wants to disprove those claims, the debtor would seek declaratory judgment relief, pursuant to the exact same provisions.
>
> So my concern with these paragraphs are that they seek to disprove the bona fides of the constructive trust claim, and I don't think

---

S.D.N.Y. Mar. 27, 2012). The Court has reviewed the transcripts of the relevant hearings, but has not found statements announcing that an evidentiary hearing would be conducted.

Appellants – who chose not to submit any declarations or rebuttal evidence prior to the sale hearing – now contend that they were not given notice that the March 22, 2012 sale hearing would be an evidentiary hearing, and thus were deprived of an opportunity to present evidence at that hearing. (MSF Brokers' Opening Br. (Dkt. No. 17) at 3, 18-22) Assuming arguendo that Appellants had no notice that the sale hearing would be an evidentiary hearing, Judge Glenn told Appellants early in the hearing that – having objected to the proposed sale – "you have the burden of proof. This is an evidentiary hearing. . . . [I]f you have evidence to offer that overcomes the language in the agreements, . . . I'll hear that. If you have evidence that you believe you can introduce, I'll decide. . . ." (Bankr. Dkt. No. 839 at 72) There is no evidence that Appellants objected to the court conducting an evidentiary hearing – either at that time or later – nor is there any indication in the materials submitted to this Court that Appellants indicated that they were not prepared to proceed with an evidentiary hearing. To the contrary, Appellants were full participants in the hearing, cross-examining witnesses and presenting oral argument. Id. at 4-5, 71, 87-94. Moreover, Appellants did not indicate to the bankruptcy judge – either at the sale hearing or later – that they had additional evidence that they wished to introduce. Under these circumstances, this Court concludes that Appellants waived any objection to the bankruptcy judge conducting an evidentiary hearing.

|   | that's the relevant question for today.  I think the relevant question for today is, insofar as my objection is concerned, whether a debtor, pursuant to Section 541 of the Bankruptcy Code, and Section 363, has an interest that can be sold. |
|---|---|
|   | I don't think we can get to whether my clients can prove up a constructive trust claim – |
| The Court: | You are.  You are. |
| Mr. Glenn: | Okay. |
| The Court: | I had announced this is an evidentiary hearing, you filed an objection that – asserting that your clients – that there's a constructive trust with respect to commissions that Grubb & Ellis received that are due to your client.  You have asserted the objection, you have the burden of proof.  This is an evidentiary hearing; I announced it would be an evidentiary hearing, and we will go forward. |
|   | And if you have evidence to offer that overcomes the language in the agreements, if I hear objections that the documents are clear on the face, I'll hear that.  If you have evidence that you believe you can introduce, I'll decide, if there are objections to it.  But your objection is otherwise overruled. |
| Mr. Glenn: | Thank you, Your Honor. |

(Id. at 72-73)  Although counsel acknowledged that it was necessary to bring a constructive trust claim through a Rule 7001 adversary proceeding (id. at 72), Appellants never requested or initiated such a proceeding.

At the sale hearing, Appellants had an opportunity to cross-examine all of the Debtors' and BGC's witnesses, including CFO Rispoli.  On cross-examination, Rispoli testified that the Debtors' accrued obligations with respect to unpaid commissions amounted to "about $5 million of commissions that would have been due in the normal course" (id. at 84), and included "approximately one and a half million dollars of commissions for prepetition transactions."  (Id. at 87)  Rispoli further testified that, as of the Petition Date, approximately $12 million worth of

commissions were outstanding for transactions that had not yet closed.  (Id.)  When asked how

former brokers of Grubb & Ellis were to receive their portion of the unpaid commissions, Rispoli

testified:

> I think what's been publicly stated by BGC is that the brokers who remain with
> the platform, they'll find a way to pay them.  They haven't said they're not going
> to pay the brokers who are not with the company anymore, but they haven't said
> they will.  So I really don't know.

(Id. at 89-90)

In addition to arguing that the brokers held a constructive trust over the

commissions, the Ad Hoc Committee's counsel argued – for the first time – that his clients had a

lien on all unpaid commissions pursuant to Article 2 of the New York Lien Law.  (Id. at 124-29)

During the sale hearing, the bankruptcy court expressed some hesitancy about

resolving the MSF Brokers' constructive trust claims in the context of a sale hearing.  (See id. at

142 ("[T]he issue for me is I don't quite understand why I need to resolve, in the context of this

sale hearing, whether there is a constructive trust or not. . . . [I]t's not clear to me why that needs

to be resolved. . . . I don't see why I have to resolve it."))  Appellants' counsel urged the

bankruptcy judge not to resolve the issue, arguing that "[a]ll [Appellants] want is our day in

court."  (Id. (counsel for MSF Brokers); see also id. at 129 (counsel for Ad Hoc Committee

("[W]e've asked for proposed language . . . seeking to preserve our right to assert a constructive

trust or a statutory trust . . . . That's all we're seeking today . . . . We're seeking to carve out our

rights.  We're not seeking to implement a trust, . . . We're asking simply to preserve our rights to

assert that.")

Counsel for the Debtors and BGC vigorously disputed Appellants' assertion that

ownership of the disputed commissions could be adjudicated after the bankruptcy sale had been

consummated.  BGC's counsel, Emanuel Grillo, argued that the bankruptcy court should decide
the constructive trust claim at that time, pursuant to 11 U.S.C. §§ 363(b) and 363(f):

| | |
|---|---|
| Mr. Grillo: | . . . [A constructive trust is] an interest; it's a judicially created interest that exists, that as much as Your Honor has the right to create it, Your Honor, under 363(b), and then subject to 363(f), has the right in this court, this day, based on the lack of evidence from Mr. Glenn, to overrule the objection, as it relates to BGC. . . . |
| The Court: | You may be right.  But I don't see why I have to decide that issue today. |
| Mr. Grillo: | Because – because Your Honor is ordering a sale free and clear, that's the whole – |
| The Court: | Look, I have no problem – |
| Mr. Grillo: | – it's the underlying premise of what's [happening] here. |
| The Court: | – saying, and I'll say it right now, Mr. Glenn did not offer any evidence supporting the existence of constructive trust with respect to his clients' claims for brokerage commission[s].  That is clear. He offered – he had a chance; he didn't offer any evidence.  What effect that ultimately has, I don't know.  That's clear.  I – he had a chance; he didn't offer any evidence.  I don't – |
| Mr. Grillo: | Right.  And then – and then, as a result, his objection is overruled, and our purchase is free and clear of any liens, claims, or other interests. . . . |

(Id. at 173-76)

## VI.   THE BANKRUPTCY COURT'S DECISION AND SALE ORDER

The bankruptcy court ultimately determined that the sale was a valid exercise of
the Debtors' business judgment, and approved the sale.  See In re Grubb & Ellis Co., 12-10685
MG, 2012 WL 1036071, at *3-*5 (Bankr. S.D.N.Y. Mar. 27, 2012); Mar. 27, 2012 Sale Order
(Bankr. Dkt. No. 830).  In reaching that conclusion, the bankruptcy court overruled the MSF
Brokers' Objection, finding that they had not proven their constructive trust claim.  In re Grubb
& Ellis Co., 2012 WL 1036071, at *5-*6.

The bankruptcy court began its analysis by correctly noting that, "pursuant to [11 U.S.C. §] 363(p), 'the entity asserting an interest in property has the burden of proof on the issue of validity, priority, or extent of such interest.'" Id. at *6 (quoting 11 U.S.C. § 363(p)). The MSF Brokers, however, "ha[d] not provided any evidence supporting imposition of a constructive trust at this time." Id. The bankruptcy court further noted that unjust enrichment is an element of a constructive trust claim under New York law, and that the Second Circuit has held that "unjust enrichment only exists where no prior agreement governed the rights of the parties." Id. (citing In re First Central Fin. Corp., 377 F.3d at 213). Here, of course, written agreements governed the relationship between the Debtors and the MSF Brokers.

In support of their objection, the MSF Brokers relied heavily on In re Rama Grp. of Companies, Inc., 01-CV-0424E(SR), 2002 WL 1012974 (W.D.N.Y. May 6, 2002). In Rama, the district court found that a constructive trust existed over a commission where a broker had agreed – prior to the debtor's bankruptcy – to find a buyer for the debtor's assets. In re Rama Grp. of Companies, Inc., 264 B.R. 267, 268 (Bankr. W.D.N.Y. 2001), aff'd on other grounds, 01-CV-0424E(SR), 2002 WL 1012974 (W.D.N.Y. May 6, 2002). After completion of the sale and the filing of the bankruptcy petition, the debtor failed to pay the broker his promised commission. Id. On appeal, the district court held that the broker held a constructive trust over the commission he had earned. Id.

In discussing Rama, the bankruptcy court concluded that it was distinguishable on its facts:

> Here, the Debtors are the actual "brokers" and their employees/professionals are merely "agents." (Rispoli Decl. [Br. Dkt. No. 765] ¶ 20.) Moreover, the Debtors' agreements with third-party clients provide that commissions are owed to the Debtors upon the closing of a sale or lease (not to the agents of the brokers), and the agents' right to payments stems solely from separate agreements with the Debtors and their agents (not the property owners). (Id. ¶¶ 21–23.) Thus, under

17

the facts of <u>Rama</u>, the Debtors, as the broker, may be entitled to recover unpaid
commissions under a constructive trust theory, but the Debtors' individual agents,
who are either employees or independent contractors working exclusively for the
Debtors, would not be entitled to assert a constructive trust.

<u>In re Grubb & Ellis Co.</u>, 2012 WL 1036071, at *7.

the uncontroverted evidence establishes that the funds received by Debtors from
the closing of transactions are deposited in the Debtors' general bank account.
Funds deposited in the Debtors' general bank account are commingled with funds
received from other sources, and the funds in the account are used for the general
operations of the Debtors. ([Rispoli Decl. (Br. Dkt. No. 765)] ¶ 25.) The general
account is not used exclusively for commissions. (<u>Id.</u> ¶ 25.) The evidence
established that the Debtors are the sole owner of commissions received; they are
not required to segregate commissions; and the use of commissions received is
not restricted. (<u>Id.</u> ¶ 28.) Thus, in most cases, the Debtors have contractually
provided that commissions from sales are owed to the Debtors, which the Debtors
then have an obligation to pay their agents.

<u>Id.</u>

The bankruptcy court also rejected the <u>Ad Hoc</u> Committee's reliance on the New

York Lien Law. While noting that this objection was untimely, the bankruptcy court

nevertheless went on to consider the objection on its merits. The court began its analysis by

noting that the New York Lien Law permits real estate brokers to file mechanics' liens, but that

any liens must be on real property, a category that does not include cash commissions. <u>Id.</u> at *8.

The court further noted that the <u>Ad Hoc</u> Committee had "offered no evidence to suggest that any

notice of such lien was filed in accordance with New York Lien Law." <u>Id.</u> Finally, the court

explained that "the provision allowing real estate brokers to file mechanics liens is restricted to

'brokerage contracts between a property owner/lessor and a broker.'" <u>Id.</u> (citing <u>Robert Plan</u>

<u>Corp. v. Greiner-Maltz Co., Inc.</u>, 229 A.D. 2d 122, 123 (N.Y. App. Div. 1997)). Here, by

contrast, "[t]he Debtors are the actual brokers holding contracts with property owners; the

[brokers] are agents (either employees or independent contractors) of the Debtors; the agents are not parties to the contracts with the property owners." Id.

Given these circumstances, the bankruptcy court rejected the objections of both the Ad Hoc Committee and the MSF Brokers, and approved the sale "free and clear of any liens or interests." Id. at *10. Pursuant to Fed. R. Bankr. R. 6004(h), the bankruptcy court stayed its order for seven days in order to "'provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.'" Id. (quoting 10 Collier on Bankruptcy ¶ 6004.11 (Alan N. Resnick & Henry J. Somers eds., 16th ed. 2011).

## VII.   THE INSTANT APPEAL

Appellants did not seek a further stay of the Sale Order.  Instead, on the same day that the Sale Order was issued, Appellants filed the instant appeals.  (Bankr. Dkt. Nos. 835, 837) Appellants ask this Court to impose a constructive or implied trust over the commissions or, in the alternative, to conduct an evidentiary hearing.  (MSF Brokers' Opening Br. (Dkt. No. 17) at 7; Ad Hoc Committee's Opening Br. (Dkt. No. 21) at 3)  Appellants also request a ruling that the commissions earned by the brokers after the Petition Date are not among the assets sold to BGC. Id.

## DISCUSSION

District courts are vested with appellate jurisdiction over final judgments, orders, and decrees of bankruptcy courts pursuant to 28 U.S.C. § 158(a).  On appeal, a bankruptcy court's "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52 (applicable pursuant to Fed. R. Bankr. P. 9014, 7052).[11]

---

[11] See also Jud. Conf. of the U.S., Preliminary Draft of Proposed Amendments to the Federal Rules of Appellate, Bankruptcy, and Criminal Procedure, and the Federal

While the bankruptcy court's findings of fact are not conclusive, "the party that seeks to overturn them bears a heavy burden." H & C Dev. Group, Inc. v. Miner (In re Miner), 229 B.R. 561, 565 (2d Cir. 1999). The reviewing court must be left with a "definite and firm conviction" that a mistake has been made. Ortega v. Duncan, 333 F.3d 102, 107 (2d Cir. 2003) (citation omitted). "A bankruptcy court's conclusions of law, by contrast, are reviewed de novo." In re Adelphia Commc'ns Corp., 367 B.R. 84, 90-91 (S.D.N.Y. 2007). Mixed questions of law and fact are reviewed "either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.), 554 F.3d 300, 316 n.11 (2d Cir. 2009) (citation omitted).

## I.   THE APPEALS ARE STATUTORILY MOOT

Appellants did not seek a stay of the Sale Order. Accordingly, as a preliminary matter, this Court must determine what effect, if any, Appellant's failure to seek a stay has on this Court's ability to order the relief that Appellants seek.

### A.   Applicable Law

Section 363(m) of the Bankruptcy Code states in relevant part:

> The reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis added). Pursuant to Section 363(m), "appellate jurisdiction over an unstayed sale order issued by a bankruptcy court is statutorily limited to the narrow issue of whether the property was sold to a good faith purchaser." In re Gucci, 105 F.3d 837, 839 (2d

---

RULES OF EVIDENCE 33 (2012), http://www.uscourts.gov/uscourts/rules/rules-published-comment.pdf.

Cir. 1997) ("Gucci I") (emphasis in original).  The purpose of this provision is to provide finality

without "the risk of endless litigation[.]"  In re Gucci, 126 F.3d 380, 387 (2d Cir. 1997) ("Gucci

II").

      "The Second Circuit has strictly enforced Section 363(m)[.]"  In re Motors

Liquidation Co., 430 B.R. 65, 78 (S.D.N.Y. 2010) (citing Gucci I, 105 F.3d at 840).  "[W]ithout

this assurance of finality, purchasers could demand a large discount for investing in a property

that is laden with the risk of endless litigation as to who has rights to estate property."  Gucci II,

126 F.3d 387.  "Thus, regardless of the merit of an appellant's challenge to a sale order, [a

court] may neither reverse nor modify the judicially-authorized sale if the entity that purchased

or leased the property did so in good faith and if no stay was granted."  Gucci I, 105 F.3d at 840.

      "'This limitation of the issues on appeal generally is warranted where an appellant

did not seek a stay pending appeal and reflects the view that an appellant is rightly burdened with

the risks associated with challenging a sale authorization when that appellant did not first seek to

stay the sale.'"  In re Motors Liquidation Co., 428 B.R. 43, 53 (S.D.N.Y. 2010) (quoting Gucci I,

105 F.3d at 840 (citing United States v. Salerno, 932 F.2d 117, 123 (2d Cir. 1991))); see also In

re Leatherstocking Antiques, Inc., 12 CIV. 7758 ER, 2013 WL 5423995, at *4 (S.D.N.Y. Sept.

27, 2013) ("[B]ecause Appellant does not contest the good faith of the purchasers and the Court

does not discern any basis on which to find bad faith, and because no stay of the Orders was

sought, the appeal is statutorily moot.").

      Although Section 363(m) "does not with absolute clarity forbid a court that is

reviewing a bankruptcy order of sale to a good faith purchaser from ordering 'some form of

relief other than invalidation of the sale,' it does explicitly forbid courts from 'revers[ing o]r

modif[ying]' the sale, and courts have 'regularly ruled that the appeal [from such a decision] is

moot.'" In re MSR Resort Golf Course LLC, 13 CIV. 2448 KPF, 2014 WL 67364, at *6

(S.D.N.Y. Jan. 7, 2014) (alterations in original) (quoting Gucci I, 105 F.3d at 839-40 & n.1).  In

other words, Appellants' decision to seek a modification of, rather than a reversal of, the Sale

Order does not relieve them of their burden to obtain a stay.  Indeed, courts in this District have

repeatedly rejected efforts to circumvent Section 363(m)'s requirements on this basis as resting

on a "specious distinction."  In re Lehman Bros. Holdings, Inc., 415 B.R. 77, 85 (S.D.N.Y.

2009); see also In re Metaldyne Corp., 421 B.R. 620, 626 (S.D.N.Y. 2009); In re MSR Resort

Golf Course LLC 2014 WL 67364, at *9.

>   **B.**     **Analysis**

>          There is no dispute here about procedural history.  The bankruptcy court held a

sale hearing pursuant to Section 363(b).  Appellants had notice of the sale hearing and an

opportunity to file objections to the proposed sale order.  Appellants filed such objections and

fully participated in the sale hearing.  They cross-examined witnesses, objected to proffered

evidence, and offered arguments in support of their respective objections.  After the sale hearing,

the bankruptcy court approved the sale of substantially all of the Debtors' assets.  The Sale Order

unquestionably included the disputed commissions that Appellants claim rightfully belong to

them.  Appellants did not seek or obtain a stay of the Sale Order, but instead opted to file these

appeals.

>          Because Appellants did not obtain a stay of the Sale Order, their appeals are

statutorily moot.  The bankruptcy court's memorandum opinion and the accompanying Sale

Order warn Appellants that the sale would not be disturbed unless a party who wished to appeal

first sought a stay of the Sale Order.  In re Grubb & Ellis Co., 2012 WL 1036071, at *10; Mar.

27, 2012 Sale Order (Dkt. No. 830) at ¶ 25 ("[T]he reversal or modification on appeal of the

authorization provided herein to consummate the sale shall not affect the validity of the Transactions . . . unless such authorization and consummation of such sale are duly and properly stayed pending such appeal."). Accordingly, Appellants were on notice that a stay would be necessary to avoid a finding of mootness. See In re Lehman Bros. Holdings, Inc., 415 B.R. at 83 (noting that "[the Sale Order] warned that '[a]ny party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot'").

Neither the MSF Brokers nor the Ad Hoc Committee sought a stay, however, and the sale closed on April 13, 2012. (Br. Dkt. No. 902) As a result, the only issue properly before this Court is whether the bankruptcy court committed reversible error in finding that BGC was a good faith purchaser. Appellants do not dispute that BGC was a good faith purchaser, however. There is thus nothing left for this Court to review.

In an effort to evade Section 363(m)'s limitations, Appellants contend that "statutory mootness . . . does not apply because [they] are not seeking to unwind the entire [s]ale[,] and [because] the Court can fashion relief against the proceeds of the Sale." (MSF Brokers Reply Br. (Dkt. No. 18) at 6) In making this argument, Appellants rely on Mission Iowa Wind Co. v. Enron Corp., 291 B.R. 39 (S.D.N.Y. 2003). In that case, "the court permitted an effort to seek a true reallocation of cash when a substantial portion of the payment from the purchaser to the sellers would, due to the corporate structure implicated, flow back upstream into the bankrupt estate and so return to the bankruptcy court's jurisdiction after the asset sale was complete[.]" In re MSR Resort Golf Course LLC, 2014 WL 67364 at *10.

Appellants' reliance on Mission Iowa Wind is misplaced. First, Mission Iowa Wind conflicts with Second Circuit authority holding that Section 363(m) operates to divest courts of jurisdiction to review a bankruptcy court sale order that was not stayed. See Contrarian

Funds LLC v. Artex LLC (In re WestPoint Stevens, Inc.), 600 F.3d 231, 247 (2d Cir. 2010)
(Section 363(m) "creates a rule of 'statutory mootness,' . . . which bars appellate review of any
sale authorized by 11 U.S.C. § 363(b) or (c) so long as the sale was made to a good-faith
purchaser and was not stayed pending appeal. . . . Indeed, we have equated section 363(m) to an
imposed jurisdictional limit on our authority to review the Bankruptcy Court's sale order.")

     Second, as was the case in In re MSR Resort Golf Course LLC, this Court cannot
fashion relief since "no funds remain under the jurisdiction of the Bankruptcy Court from which
the Appellant[s] could seek distribution . . . and it is impossible for the Appellant[s] to recover on
[their] claim[s] without invalidating the sale as a whole." In re MSR Resort Golf Course LLC,
2014 WL 67364, at *10.

     Finally, Appellants improperly minimize the significance of the relief they are
seeking.  While the precise amount of the disputed commissions claimed by Appellants is
unclear, that number clearly exceeds several million dollars.  (MSF Brokers Opening Br. (Dkt.
No. 17) at 23-24; Tr. (Bankr. Dkt. 839) 137-38 (MSF Brokers are due "in excess of $3 million")
Given that BGC paid approximately $50 million for Grubb & Ellis's assets, satisfying
Appellants' commission claims would not have a "relatively small impact" on the transaction, as
Appellants argue.  (MSF Brokers Reply Br. (Dkt. No. 18) at 5)  Moreover, the bankruptcy court
found that BGC "would not have entered into the APA and would not [have] consummate[d] the
sale . . . if the sale of the Acquired Assets was not free and clear of all Claims. . . ." (Mar. 27,
2012 Sale Order (Dkt. No. 830) at 11)  In sum, Appellants' argument that they are not seeking to
overturn the Sale Order, but merely to modify its terms, rests on a "specious distinction." In re
Lehman Bros. Holdings, Inc., 415 B.R. at 85; In re Metaldyne Corp., 421 B.R. at 626; In re MSR
Resort Golf Course LLC 2014 WL 67364, at *6.

Appellants also contend that since "the MSF Brokers' trust claims must be determined according to New York state law[,]" those claims "cannot be mooted where the Bankruptcy Court exceeds its jurisdiction and tramples on state law property rights." (MSF Brokers Reply Br. (Dkt. No. 18) at 6)  Setting aside the fact that Appellants waived any argument that the bankruptcy court "exceed[ed] its jurisdiction" – having not raised this argument until their reply brief on this appeal – the argument fails on its merits.  Whether the disputed commissions are property of the Debtors' estate plainly raises an issue within the bankruptcy court's "core jurisdiction under 28 U.S.C. § 157(b).  See, e.g., In re Velo Holdings Inc., 475 B.R. 367, 386 (Bankr. S.D.N.Y. 2012) ("The determination whether something is property of the estate is a core matter."); In re Reliance Grp. Holdings, Inc., 273 B.R. 374, 395 (Bankr. E.D. Pa. 2002) (proceeding to determine property of a bankruptcy estate pursuant to 11 U.S.C. § 541 concerns a core matter, "even though such a determination may rest upon interpretation of state law").

Moreover, the bankruptcy court did not – as Appellants argue – "disregard[ ]" the MSF Brokers' state law property rights or "trample[ ] on basic principles of federalism and comity. . . ." (MSF Brokers' Opening Br. (Dkt. No. 17) at 32-33)  To the contrary, the bankruptcy court's opinion approving the sale contains an extensive discussion of New York constructive trust and lien law and its interplay with the Bankruptcy Code.  See In re Grubb & Ellis Co., 2012 WL 1036071, at *6-*9.  To the extent that the bankruptcy court concluded that it could not permit the constructive trust doctrine to "creat[e] a separate allocation mechanism outside the scope of the bankruptcy system," the court relied on well established law from this and other circuits.  Id. at *7.

Because (1) Appellants did not obtain a stay of the Sale Order, and (2) there is no dispute that BGC was a good-faith purchaser, the consolidated appeals are statutorily moot.

## II.    THE APPEALS ARE EQUITABLY MOOT

The consolidated appeals must also be dismissed on grounds of equitable mootness.

### A.    Applicable Law

The doctrine of equitable mootness is "a prudential doctrine under which the district court may dismiss a bankruptcy appeal 'when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'" In re Charter Commc'ns, Inc., 691 F.3d 476, 481 (2d Cir. 2012) (quoting Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d 322, 325 (2d Cir. 1993) ("Chateaugay I")). "Equitable mootness 'is concerned with whether a particular remedy can be granted without unjustly upsetting a debtor's plan of reorganization.'" In re MSR Resort Golf Course LLC, 2014 WL 67364, at *10 (quoting Chateaugay I, 691 F.3d at 481).

"[A]n appeal is presumed equitably moot where the debtor's plan of reorganization has been substantially consummated." In re MSR Resort Golf Course LLC, 2014 WL 67364, at *10 (quoting In re Charter Commc'ns, 691 F.3d at 482). The Bankruptcy Code provides that a plan has been "substantially consummated" when there has been:

> "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."

In re PC Liquidation Corp., 383 B.R. 856, 863 (E.D.N.Y. 2008) (quoting 11 U.S.C. § 1101(2)).

"A determination [of] whether substantial consummation has occurred depends on the facts and

circumstances of each case[,]" but "[t]he burden of proof is on the proponent of the

modification." In re Boylan Int'l, Ltd., 452 B.R. 43, 48 (Bankr. S.D.N.Y. 2011) (citing 7 Collier

on Bankruptcy ¶¶ 1127.03[2], 1101.02[1][a]).

"An appeal of a bankruptcy transaction is equitably moot unless all [of the

following] five factors are met," In re PC Liquidation Corp., 383 B.R. at 863 (emphasis in

original):

> (1) that the Court can still order effective relief; (2) that such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity;" (3) that such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court;" (4) that the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings;" and (5) that the appellant "pursued with diligence all available remedies to obtain a stay of execution of the objectionable order * * * if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."

Id. (quoting Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 953 (2d Cir.

1993) ("Chateaugay II")); see also In re Granite Broad. Corp., 385 B.R. 41, 50 (S.D.N.Y. 2008)

(quoting Chateaugay II, 10 F.3d at 952-53).

"It is well settled that 'when a stay of an order confirming a reorganization plan

pending appeal has not been obtained and the plan has been consummated, the appeal may be

dismissed as moot.'" In re Granite Broad. Corp., 385 B.R. at 51 (quoting In re Revere Copper

and Brass Inc., 78 B.R. 17, 20 (S.D.N.Y. 1987) (collecting cases); In re Metromedia Fiber

Network, Inc., 416 F.3d 136, 145 (2d Cir. 2005)). "[T]he Second Circuit demands that a party

seek a stay 'even if it may seem highly unlikely that the bankruptcy court will issue one.'" In re

Granite Broad. Corp., 385 B.R. at 51 (quoting In re Metromedia Fiber Network, Inc., 416 F.3d at

144). "A party cannot escape the obligation to protect its litigation position by so facile an

argument." Chateaugay I, 988 F.2d at 326.

An appellant is required to seek a stay even where it is not seeking to "unravel[ ]
the Plan." In re Metromedia Fiber Network, Inc., 416 F.3d at 145 ("In the absence of any
request for a stay, the question is not solely whether we can provide relief without unraveling the
Plan, but also whether we should provide such relief in light of fairness concerns.") (emphasis in
original); see also In re Arcapita Bank B.S.C.(c), BR 12-11076, 2014 WL 46552, at *7
(S.D.N.Y. Jan. 6, 2014) ("There is no support for Appellant's contention that seeking a stay of
the orders was not important because the Plan resulted in the liquidation of the Debtors.  It
should have been obvious to Appellant . . . that the Debtors and third parties would have to
perform hundreds of transactions to implement and carry out its terms.").

**B.      Analysis**

Here, the sale of substantially all of the Debtors' assets has been "substantially
consummated."  The sale to BGC closed on April 13, 2012.  (Notice of Effective Date (Dkt. No.
902))  Since that date, BGC has either been assigned or rejected thousands of contracts, acquired
ownership of all of the Debtors' assets, and continued the employment of nearly 2,000 of the
Debtors' former employees.  (Appellees' Joint Opening Br. (Dkt. No. 15) at 13 (citing dozens of
items from the bankruptcy record))  Appellants' conclusory statement that "there has been no
comprehensive change of circumstances" does not suffice to show that the relief they request is
either possible or equitable.  (MSF Brokers Reply Br. (Dkt. No. 18) at 7)

Moreover, Appellants have not satisfied several of the Chateaugay factors.  As
discussed above, Appellants never sought a stay of the Sale Order; accordingly, the last
Chateaugay requirement has not been met.  In re Metromedia Fiber Network, Inc., 416 F.3d at
145.  In addition – because the monetary sum Appellants seek is so large – any relief ordered by
this Court would carry a significant risk of "knock[ing] the props out" from under the sale.  In re

Granite Broad. Corp., 385 B.R. at 50 (quoting Chateaugay II, 10 F.3d at 952-53).  For all these reasons, the consolidated appeals are equitably moot.[12]

### CONCLUSION

For the reasons stated above, the appeals of the MSF Brokers and the Ad Hoc Committee of Brokers are statutorily and equitably moot.  Accordingly, the bankruptcy court's order approving the Sale Motion is hereby affirmed.  The Clerk of the Court is directed to terminate as moot any outstanding motions and to close these cases (Dkt. Nos. 12 Civ. 3628 (PGG), 12 Civ. 3756 (PGG)).

Dated: New York, New York
          December 12, 2014

SO ORDERED.

_Paul S. Gardephe_
Paul G. Gardephe
United States District Judge

---

[12]  Although the consolidated appeals are both statutorily and equitably moot, it bears mention that the relief requested by Appellants is different than that sought in bankruptcy court.  Neither the MSF Brokers' "Limited Objection" nor the Ad Hoc Committee's "Statement Seeking Clarification and Reservation of Rights" challenged the sale on the ground that the Debtors were required to initiate an adversary proceeding under Bankruptcy Rule 7001.  Similarly, neither objection requested that the bankruptcy court issue a declaratory judgment as to whether post-petition commissions were being sold, or could be sold, to BGC free of any liens or constructive trust claims.  "'[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.'"  Bogle-Assegai v. Connecticut, 470 F.3d 498, 504 (2d Cir. 2006) (quoting Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994)).  In accordance with this rule, district courts considering appeals from bankruptcy court refuse to consider arguments that were not properly presented to the bankruptcy court.  See, e.g., In re Worldcom, Inc., 07 CIV. 3408 DLC, 2007 WL 2682882, at *8 (S.D.N.Y. Sept. 14, 2007) ("[Appellant] has waived this argument by failing to raise it adequately in the bankruptcy court.").  Appellants' failure to seek in bankruptcy court the relief that they seek here provides an independent basis for rejecting their appeals.